IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:04CV332-C

| | |
|---|---|
| SHELIA T. LATTA,  )<br>      Plaintiff,  )<br>  )<br>  vs.  )<br>  )<br>JO ANNE B. BARNHART,  )<br>Commissioner of Social  )<br>Security Administration,  )<br>      Defendant.  )<br>  ) | **MEMORANDUM AND RECOMMENDATION** |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" and "Memorandum in Support ... " (both document #15), filed June 7, 20, 2005; and the Defendant's "Motion For Summary Judgment" (document #18) and "Memorandum in Support of the Commissioner's Decision" (document #19), both filed August 24, 2005. This case has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned will respectfully recommend that Plaintiff's Motion for Summary Judgment be denied; that Defendant's Motion for Summary Judgment be granted; and that the Commissioner's decision be affirmed.

**I. PROCEDURAL HISTORY**

On February 27 and March 19, 1996, the Plaintiff filed respective applications for Supplemental Security Income (SSI) and Social Security Disability Insurance Benefits (DIB), alleging that she became disabled sometime in 1989 or 1990 due to "swelling" in her feet. (Tr. 131).

The Plaintiff's claims were denied initially and on reconsideration. After a hearing, in a decision dated February 11, 1997, an ALJ found that Plaintiff was not disabled. On March 20, 1998, the Appeals Council granted Plaintiff's request for review and remanded the case for further administrative proceedings.

After a second hearing, in a decision dated June 23, 1998, an ALJ again found that Plaintiff was not disabled, but on February 16, 2000, the Appeals Council again granted Plaintiff's request for review and remanded the case.

A new hearing was held, and on August 25, 2000, an ALJ found that Plaintiff was not disabled. On August 3, 2001, the Appeals Council denied Plaintiff's request for review, and the Plaintiff subsequently filed an appeal in this Court. On July 22, 2002, pursuant to a consent order, the case was remanded for further administrative proceedings.

On July 25, 2003, a fourth hearing was held. On February 23, 2004, the ALJ issued an opinion denying the Plaintiff's claim. Subsequently, the Plaintiff timely filed a Request for Review of Hearing Decision. On May 3, 2004, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

The Plaintiff filed this action on July 9, 2004, and the parties' cross-motions for summary judgment are now ripe for disposition.

## II. **FACTUAL BACKGROUND**

At the fourth hearing, the Plaintiff testified that she was a high school graduate and had a drivers' license; that she lived with her two sons, then ages eleven and fourteen, in a public housing project; that despite her medical condition, discussed below, she could work for short periods of time at a standing job, but that she must alternate between standing, walking, and sitting with her feet

2

elevated to a level even with her hips; that she worked subsequent to 1992 despite the need to elevate her feet; that she had worked at a fast-food restaurant, in a data entry job at a bank, and at a child care center; that at her fast-food job, she had been allowed a 15-minute break every two hours that she spent sitting with her feet elevated; that she had also drawn unemployment benefits, applying for jobs and holding herself out as "ready, willing and able" to work so as to maintain eligibility for those benefits; and that she was then in the process of looking for a job and had contacted personnel at the bank and at the daycare where she formerly worked about the possibility of returning to a part-time position.

Regarding her medical and emotional condition, the Plaintiff testified that she suffered lymph edema and chronic arthralgia; that she developed pain and swelling in her feet in 1992 following the birth of her second child; that the condition seemed to get progressively more severe to the point that she could no longer wear regular shoes; that she took diuretics to reduce the fluid in her lower extremities; that she suffered migraine headaches that were controlled by the prescription medication Imitrex; that she used a foot pump (an apparatus that applied external air pressure by mechanical means) twice a day, that is, two hours in the morning and two hours before going to bed, to reduce the fluid in her legs and feet; that she needed to sit frequently and elevate her feet; that she had been taking the same medication for more than three years; and that she saw her family physician on a yearly basis for a physical examination, but otherwise was not receiving or seeking any medical treatment.

Concerning her daily activities, the Plaintiff testified that she took care of her sons; that she attended church regularly; that she enjoyed reading, watching television, and sitting on the porch; that she was able to drive, go to the grocery store, and take her sons to the park; that friends visited

her often; and that they would have conversations and play cards or monopoly.

The Plaintiff's sister, Melinda Thompson, testified that the Plaintiff did not perform household chores and could not work due to needing to sit with her feet elevated.

A Vocational Expert ("V.E.") characterized the Plaintiff's prior work experience as light and unskilled (fast food), light and semi-skilled (child care), and sedentary and semi-skilled (data entry).

The ALJ then presented the V.E. with the following hypothetical:

> a claimant with the same age,[1] education, and work background as [the Plaintiff] ... are there any jobs at the sedentary exertional level that would accommodate ... only occasional climbing and balancing; no standing or walking more than two hours in a day without a 15-minute break every two hours to elevate [her] legs at a height of a sitting chair ...?

(Tr. 452-53.)

The VE testified that with these limitations, the Plaintiff could perform a data entry job and that 11,000 of these jobs were available in North Carolina.

The record also contains a number of representations by Plaintiff as contained in her various applications in support of her claims. On her Disability Report, Plaintiff stated that her disabling condition was "swelling" in her feet (Tr. 131); that she took care of her sons and performed all household chores, including cooking, cleaning, and "outside yard work" (Tr. 134); that she visited her "mother, sisters, cousin, [and] aunts" id.; and that she owned and drove a car.

A Report of Contact, dated March 18, 1996, reflects that the Plaintiff stated that she had not seen a doctor in two months; that she could perform all household chores and care for her sons; and that she could go shopping.

---

[1] Although the Plaintiff did not testify as to her age, the record reflects that she was born May 25, 1960, and was 42 years-old at the time of the fourth hearing.

4

On an undated Claimant's Statement When Request for Hearing Is Filed, the Plaintiff stated that her condition was worse but that her daily activities were unchanged.

On April 25, 1996, Margaret Wilson, M.D., a Government medical expert, completed a Physical Residual Functional Capacity Assessment and concluded that the Plaintiff had "no physical restrictions." (Tr. 168.)

On May 20, 1996, Bhupendra L. Sen, M.D., also a Government medical expert, completed a Physical Residual Functional Capacity Assessment and concluded that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; that she could sit, stand or walk six hours in an eight-hour work day; that she had unlimited ability to push and/or pull; that Plaintiff should avoid more than occasional climbing or balancing and concentrated exposure to hazards; but that with those restrictions, the Plaintiff could perform medium work. Dr. Sen further noted that Plaintiff's medical records revealed that the swelling in her feet was described as "mild" or "moderate" and was not painful; that Plaintiff had told her doctors that she performed regular household chores; and that Plaintiff had good circulation in her feet.

The parties have not assigned error to the ALJ's recitation of the medical records, submitted at or after the fourth hearing. Moreover, the undersigned has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

> The medical records show that from September 1993 through October 1995, the claimant was treated at the Carolina's Medical Center Outpatient Department for swelling in her feet. In September 1993, treatment notes show that the claimant reported that the swelling was worse in hot weather and resolved in cold weather (Exhibit 18/3). Treatment notes, dated December 1994, indicated that the claimant continued to complain of idiopathic edema which was not controlled with the use of Furosemide (Exhibit 18/4). On September 5, 1995, the claimant presented to an emergency room with a hot, swollen right foot. She was released with a diagnosis

of gout vs. celluloids, and given prescriptions for Keflex and Indocin. The attending physician noted that the claimant's regular doctor would be called in the morning (Exhibit 19). The following morning, the claimant reported to her treating physician that she noticed some decrease in edema. The claimant's physician concluded that she had possible celluloids because of sores and an apparent toe infection (Exhibit 18/5). The claimant's treating physician evaluated her again on September 1995, and concluded that she had idiopathic edema with recent celluloids which had improved (Exhibit 18/6).

In January 1993, a podiatrist at the Metrolina Comprehensive Health Center, Inc., evaluated the claimant for bilateral limb swelling since 1988, and referred her to vascular specialist (Exhibit 20/3). On January 25, 1996, Dr. O. N. Eruchalu, a vascular specialist, evaluated the claimant, and concluded that she had lymph edema of both feet. Dr. Eruchalu recommended that the claimant continue to wear support stockings and to keep her feet elevated as necessary (Exhibit 20/6). In April 1996, Dr. Gary Tignor reported that the claimant's lymph edema would affect her ability to work because she had to keep her feet elevated, she was unable to stand for long periods of time, and she was fatigued. Dr. Tignor added that the claimant would be unable to work for an indefinite period of time (Exhibit 25).

In June and July 1996, Dr. Eruchalu noted slight edema with the claimant being in no distress. She was advised to continue wearing support stockings and take her diuretic, Maxzide. Further, Dr. Auricula stated that he was pursuing the availability of trial compression pump therapy (Exhibit 27). By letter dated July 15, 1995, Dr. Eruchalu reported that the claimant had chronic lymph edema of both feet, and that she required elevation of both feet for prolonged periods everyday as part of her medical management (Exhibit 20/7). In September 1996, Dr. Eruchalu noted that the claimant had lymph edema of both lower extremities with no evidence of heart, liver, or renal failure (Exhibit 27).

[Plaintiff] underwent a consultative examination performed on September 10, 1997, by Dr. Earl J. Epps, Jr., a Board-certified family practitioner. Dr. Epps noted that the claimant had chronic lymph edema of the lower extremities with chronic bilateral swelling in her feet and ankles. He stated that she would be unable to stand for long periods of time or walk long distances. He also noted that she had a history of hypertension, well-controlled on medication (Exhibit B-3F)....

Recent notes from Dr. Eruchalu indicate that the claimant should avoid standing for greater than two hours at a time and would need a fifteen minute break every two hours to elevate her feet (Exhibit B-6F). There are notes in the file from an office visit with Dr. Eruchalu on February 23, 1998. At that time the claimant told Dr. Eruchalu that she had started a job at a fast food restaurant and that she was required to stand for a seven hour shift each day, five days a week on this job. She also reported to him that she had not obtained the Jobst stockings which he had prescribed

for her. Dr. Eruchalu reiterated to the claimant the importance of wearing the support stockings and advised her to limit her standing to two hours out of the work day.

Subsequent to the claimant's prior hearing, the Administrative Law Judge sent interrogatories concerning the claimant to Dr. Eruchalu, a treating vascular specialist familiar with her condition. In a statement dated April 20, 1998, Dr. Eruchalu stated that he had advised the claimant to use a compression airbag that mechanically reduces swelling in the lower extremities. He stated that she needed to use this device one hour a day on each leg. When asked if there was any difference between standing and sitting with the feet down in regards to the degree of swelling expected, Dr. Eruchalu replied that there was not. Dr. Eruchalu stated that, if the claimant were able to have a fifteen minute break to elevate her feet every two hours, she should be able to work for eight to twelve hours without difficulty. When asked if she could work an eight hour day, five days a week, Dr. Eruchalu replied that she could (B-8F, 2).

(Tr. 408-409.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler,

782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was therefore whether the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[2]

---

[2] Under the Social Security Act, 42 U.S.C. §301, et seq., the term "disability" is defined as an:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had engaged in substantial gainful activity following her alleged disability onset date;[3] that the Plaintiff suffered lower extremity edema, which was a severe impairment within the meaning of the Regulations; but that Plaintiff's impairment or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that the Plaintiff was unable to perform her past relevant work on a full-time basis; that Plaintiff had the residual functional capacity for a wide range of sedentary work,[4] limited by no more than occasional climbing or balancing, and no standing or walking for periods greater than two hours without a 15-minute break to elevate her legs; and that the Plaintiff was a "younger individual" with a high school education.

The ALJ then correctly shifted the burden to the Defendant to show the existence of other jobs in the national economy which the Plaintiff could have performed. The ALJ concluded that the VE's testimony, which was based on a hypothetical that factored in the above limitations, provided substantial evidence that there <u>were</u> a significant number of jobs in the national economy that the Plaintiff could perform and that, therefore, she was <u>not</u> disabled.

---

[3]As discussed below, notwithstanding his finding at the first step of the sequential analysis that the Plaintiff had engaged in substantial gainful activity, the ALJ found the Plaintiff not disabled based on her residual functional capacity for sedentary work and the existence of a significant number of jobs in the national economy that she could perform.

[4]20 C.F.R. § 404.1567(a) defines "sedentary work" as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

The Plaintiff essentially appeals the ALJ's determination of her residual functional capacity ("RFC"). See Plaintiff's "Motion for Summary Judgment" and "Memorandum in Support ... " (both document #15). The undersigned finds that Plaintiff's assertion of error is without merit, however, and that substantial evidence supports the ALJ's conclusions regarding the Plaintiff's residual functional capacity.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged impairments limited her ability to work. Agency medical evaluators concluded that the Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; that she could sit, stand or walk six hours in an eight-hour work day; that she had unlimited ability to push and/or pull; that Plaintiff should avoid more than occasional climbing or balancing, or hazards; that the Plaintiff had no other restrictions; and that Plaintiff had the residual functional capacity for medium work.

However, the ALJ found the Plaintiff not disabled based on her ability to perform sedentary work, that did not require balancing, climbing, or exposure to heights, or more than two hours standing or walking without a 15-minute break to elevate her legs, job requirements that the Plaintiff admitted in her testimony that she was capable of performing.

The undersigned notes that Dr. Eruchalu, the Plaintiff's treating vascular specialist, opined that Plaintiff could work forty hours per week, so long as she received a 15-minute break every two

hours, limitations that were assessed in determining the Plaintiff's residual functional capacity, as discussed above. The Plaintiff assigns error to the ALJ's decision to give controlling weight to Dr. Eruchalu's opinion, as well as to the ALJ's decision not to give controlling weight to Dr. Tignor's April 1996 opinion that the Plaintiff was then unable to work for an indefinite period of time.

The Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). Rather, a treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

Applying these legal principles, the ALJ's decision to allow controlling weight to Dr. Eruchalu's opinion but give "significantly less weight" to Dr. Tignor's opinion is supported by substantial evidence. Indeed, unlike Dr. Tignor, who apparently treated the Plaintiff only briefly in the Spring of 1996, Dr. Eruchalu treated the Plaintiff from January 1996 through at least April 1998, when he rendered his opinion that the Plaintiff could work. Following office visits in June and July 1996, that is, only a few months after Dr. Tignor gave his unsupported opinion that the Plaintiff could not work for an indefinite period, Dr. Eruchalu noted that the swelling in the Plaintiff's feet was "slight" and that she was in no distress.

11

Moreover, Dr. Eruchalu's records reflect that the Plaintiff told him in February 1998 that she was not wearing her Jobst stockings as he had recommended and that she was working at a fast food restaurant, standing for a seven-hour shift five days per week. Based on these statements and the results of physical examinations conducted over more than a two-year period, in a statement dated April 20, 1998 that he gave in response to Interrogatories submitted by the Defendant, Dr. Eruchalu stated that so long as the Plaintiff were able to take a 15-minute break to elevate her feet every two hours, she should be able to work for eight to twelve hours without difficulty. When asked if she could work an eight hour day, five days a week, Dr. Eruchalu replied that she could.

Rather than proving the existence of a disability, the medical record clearly supports the ALJ's essential conclusion that the Plaintiff suffered from, but was not disabled by, lower extremity edema. Indeed, the Plaintiff testified at the July 2003 hearing that she had been taking the same medication for more than three years, which relieved at least some of her symptoms, and that she saw her family physician on a yearly basis for a physical examination, but otherwise was not receiving or seeking any medical treatment. The record is also undisputed that Plaintiff's migraine headaches and high blood pressure were well controlled by medication. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965).

The Plaintiff also underwent a consultative examination, performed on September 10, 1997, by Dr. Epps, who noted that the Plaintiff had chronic lymph edema with swelling in her feet and

ankles, but placed limits on the Plaintiff's activities that were similar to those set by Dr. Eruchalu, that is, Dr. Epps stated that Plaintiff was unable to stand for long periods of time or walk long distances.

The record also establishes that the Plaintiff engaged in significant daily life activities during the subject period, such as living with and being the sole care-giver for her two sons, performing a wide variety of household chores and yard work, driving, shopping, and visiting with family and friends; and that Plaintiff was also able to perform basic cognitive and physical tasks. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work" which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation

must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's lower extremity edema – which could be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in Craig. However, the ALJ also correctly evaluated the "intensity and persistence of [her] pain, and the extent to which it affects [her] ability to work," and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter, 993 F.2d at 31 (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on with moderate daily activities, that is, Plaintiff's ability to take care of her sons, do household chores, to drive, and to go to the grocery store, as well as the objective medical record, discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v.

Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the Plaintiff's residual functional capacity.

## V. RECOMMENDATIONS

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that Plaintiff's "Motion For Summary Judgment" (document #15) be **DENIED;** that Defendant's "Motion for Summary Judgment" (document #18) be **GRANTED**; and that the Commissioner's determination be **AFFIRMED.**

## VI. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, ___ (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th

Cir. 1997); Snyder, 889 F.2d at 1365.  Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal.  Diamond, 416 F.3d at ___ ; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; and to the Honorable Robert J. Conrad, Jr.

**SO RECOMMENDED AND ORDERED.**

**Signed: August 25, 2005**

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge